FILED
JOHN P. HEHMAN
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

2012 NOV 14 PM 3: 39

| | | |
|---|---|---|
| E³ BIOFUELS, LLC, | ) | CASE NO. *1:12 mc 76* |
| | ) | |
| Plaintiff, | ) | SPIEGEL, J. |
| | ) | M.J. LITKOVITZ |
| -vs- | ) | **MOTION TO COMPEL RESPONSES TO A** |
| | ) | **SUBPOENA DUCES TECUM** |
| | ) | **FOR ACTION PENDING BEFORE** |
| BIOTHANE CORPORATION and | ) | **THE UNITED STATES DISTRICT** |
| PERENNIAL ENERGY, INC.,| ) | **COURT FOR THE DISTRICT OF** |
| | ) | **NEBRASKA** |
| Defendants. | ) | |

**COMES NOW** Perennial Energy, Inc. ("PEI"), and pursuant Fed. R. Civ. P. 37(a) and 45(c)(2)(i) requests that the Court issue an order compelling Katzen International, Inc. ("Katzen") to respond to a subpoena that was served upon it, via certified mail, on or about October 31, 2012 and personally served upon its agent on October 25, 2012. See Exhibits A and B. Said subpoena was served for an action titled: *E3 Biofuels, LLC v. Biothane, LLC and Perennial Energy, Inc.*, U.S. District Court of Nebraska, Case No. 8:11-00044.

In compliance with Fed. R. Civ. P. 45(b)(4), Exhibit C contains proof that this subpoena was served, via certified mail and personal service.

Attached hereto and marked as Exhibit CC is an Affidavit that certifies the good faith attempts made by PEI's counsel to confer with Katzen's counsel and obtain the requested discovery without court action.

Pursuant to Fed. R. Civ. P. 45(e), PEI requests that the court hold Katzen in contempt and impose sanctions, including an award of attorney's fees, as Katzen has failed to obey the subpoena without an adequate excuse.

PEI also requests a telephonic hearing to further discuss the issues presented in this motion and whatever response Katzen presents to this Motion. PEI estimates that the time required for the telephonic hearing will be approximately thirty minutes.

The U.S. District Court for Nebraska recently entered an expedited Scheduling Order for this case and, therefore, PEI respectfully requests that this Court expedite the scheduling of a hearing for this matter, as well as its issuance of its ruling on this Motion.

**WHEREFORE,** PEI requests that Court issue an order compelling Katzen to produce more adequate responses to the subpoena that it was served with at its own expense, as well as holding them in contempt and ordering them to pay the costs and attorney's fees PEI incurred to enforce this subpoena.

PERENNIAL ENERGY, INC., Movant/Defendant

/s/ Michael Mahon
Michael Mahon, Esq.  (0087296)
Reminger Co., L.P.A.
525 Vine Street, Suite 1700
Cincinnati, OH 45209
Phone: (513) 721-1300
Email: MMahon@reminger.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of November, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

R. Guy Taft
Strauss Troy Co. LPA
150 East Fourth Street
4th Floor
Cincinnati OH 45202-4018
email : rgtaft@strausstroy.com

**Attorney for Respondent, Katzen International, Inc.**

/s/ Michael Mahon
Michael Mahon, Esq., (0087296)
Reminger Co., L.P.A.
525 Vine Street, Suite 1700
Cincinnati, OH 45209
Phone: (513) 721-1300
Email: MMahon@reminger.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| E³ BIOFUELS, LLC | ) | CASE NO. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| | ) | |
| BIOTHANE CORPORATION and | ) | |
| PERENNIAL ENERGY, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF PERENNIAL ENERGY, INC.'S MOTION TO COMPEL KATZEN INTERNATIONAL, INC.'S RESPONSE TO A SUBPOENA THAT WAS SERVED UPON IT FOR A MATTER PENDING BEFORE THE U.S. DISTRICT COURT OF NEBRASKA: *E3 BIOFUELS LLC, V. BIOTHANE, LLC AND PERENNIAL ENERGY, INC.*, CASE NO. 8:11 00044.**

Prepared and submitted by:

PERENNIAL ENERGY, INC., Movant/Defendant

s/ Michael Mahon_____
Michael Mahon, Esq. (0087296)
Reminger Co., L.P.A.
525 Vine Street, Suite 1700
Cincinnati, OH 45209
Phone: (513) 721-1300
Email: MMahon@reminger.com

1

# I.  INTRODUCTION

This is an action to enforce a subpoena that was served upon Katzen International, Inc. ("Katzen") for matter titled *E3 Biofuels, LLC v. Biothane, LLC and Perennial Energy, Inc.*, U.S. District Court of Nebraska, Case No. 8:11-00044.  Katzen has objected to the subpoena for various reasons.  Efforts to resolve this discovery dispute have now stalled.  For the reasons discussed below, Perennial Energy, Inc. ("PEI") hereby requests that the Court enter an order overruling Katzen's objections, compelling Katzen's compliance with the subpoena, finding Katzen to be in contempt, and imposing appropriate sanctions.

# II.  OVERVIEW OF *E3 BIOFUELS, LLC V. BIOTHANE, LLC AND PERENNIAL ENERGY, INC.*, U.S. DISTRICT COURT FOR THE DISTRICT OF NEBRASKA, CASE NO. 8:11-00044

1. On or about July 1, 2011, E3 Biofuels, LLC ("E3") filed an Amended Complaint against Biothane LLC ("Biothane"); Dilling Mechanical Contractors, Inc. ("Dilling"); and Perennial Energy, Inc. ("PEI").  Exhibit D.

2. In said Complaint, E3 alleged Biothane, Dilling, and PEI had a duty to "supply, start-up, and warrant a Dual Fueled Double Boiler System ("Boiler System") and controls, as well as manage and take responsibility for integration of the Boiler System into the "Solid Waste Management System & Ethanol Production Facility ("Ethanol Plant")."  Exhibit D, ¶ 5 (emphasis added).

3. The Amended Complaint also alleges "[t]he original construction, installation, testing, commissioning and startup of the Ethanol Plant was not substantially completed, and the Ethanol Plant never operated as intended, due to the failure of the Defendants."  Exhibit D, ¶¶ 7, 23, and 24 (emphasis added).

4. It is further alleged by E3 that on February 9, 2007 PEI was grossly negligent in causing an explosion in Boiler B-602 and that the damage from the explosion was never repaired, which prevented substantial completion of the "overall Ethanol Plant."  Exhibit D, ¶ 16-19 (emphasis added).

5. On November 30, 2007, E3 filed for bankruptcy and, through this lawsuit, E3 claims the bankruptcy was caused by the February 9, 2007 incident.  Exhibit D, ¶ 23.

2

6. In its Answer, PEI denied E3's allegations regarding the construction, installation, testing, commissioning, and start-up of the Ethanol Plant, including the allegation that the Ethanol Plant was not substantially completed or never operated as intended. Exhibit E, ¶¶ 4 and 12.

7. PEI also affirmatively alleged, among other things: that E3's damages "were caused by [E3's] own negligence"; that E3's damages were caused by "the acts or omissions of third parties…over whom this Defendant had no control [, including Katzen and Dilling]"; that E3 "has not been damaged to the extent alleged"; that E3 "failed to mitigate its damages, if any"; and that "[E3's] damages, if any, are too speculative to be awarded." Exhibit E, ¶¶ 37 – 51.

8. In the Rule 26(f) Report for this case, PEI re-iterated its defense that E3's damages, if any, were caused by E3's own negligence because E3 failed to: retain an engineer to design the Ethanol Plant, properly design the Ethanol Plant, construct the Ethanol Plant in a workman like manner, and install the proper support systems for the boilers, among other things. Exhibit F, p. 24, Defense No. 13.

9. PEI also alleged that any losses E3 may have sustained are for nominal amounts because "there were other parts of the plant not functioning properly, which lead to [E3] not needing the use of Boiler 602" and/or that such losses are too speculative to be awarded because there were "numerous other problems being experienced at the plant", all of which may have prevented the Ethanol Plant from operating as intended. Exhibit F, pp. 30 and 33, Defense Nos. 18 and 20.

10. PEI's defenses were and still are based upon extensive documentation that discusses the multiple non-boiler related issues the Ethanol Plant was having with regards to its construction, start-up, and operation, which included, among other things:

    a. Problems with the Hammermill, Wetcake Conveyor, Jet Cooker, Steam Distribution System, Cooling Tower, Sumps, and an ammonia deficiency. See Exhibits G, I, and J.

    b. Katzen had involvement in designing, constructing, and/or resolving these issues. Exhibits G, H, I, and J.

3

11. And, in the midst of start-up efforts, Katzen's performance on this project was criticized; likewise, Katzen criticized the performance of other contractors on the project, including Dilling. Exhibit I, p. 2.

12. Katzen's representative acknowledged that as of November 1, 2007 there were non-boiler related issues affecting the Ethanol Plant's yields (i.e. operation), including a lack of ammonia. Exhibit J.

13. And, Pete Sandfort, a Katzen representative, has described the Ethanol Plant as a "unilateral E3 disaster." Exhibit M, p. 162:19-22.

14. On or about February 5, 2010, Katzen entered into an Amended & Restated Consulting & Engineering Services Agreement wherein E3's successor in interest, AltEn, LLC, agreed to pay Katzen the amounts E3 owed Katzen under the original Consulting & Engineering Services Agreement before E3 filed bankruptcy (i.e. $613,000), as well as a "cure amount" of $140,000; in exchange, Katzen agreed to continue to provide engineering and consulting services for the Ethanol Plant. Exhibit N, pp. 6-7.

15. On or about February 5, 2010, Katzen entered into an Amended & Restated License Agreement wherein E3's successor in interest, AltEn, LLC, agreed to pay Katzen the amounts E3 owed Katzen under the original Licensing Agreement before E3 filed bankruptcy (i.e. $200,000), as well as a "cure amount" of $300,000; in exchange, Katzen agreed to continue to grant AltEn, LLC a license to use the Ethanol Plant technology. Exhibit O, pp. 2-3.

16. Despite the above noted records that suggest otherwise, Katzen's president, Phillip Madson, issued two expert reports for a related lawsuit[1] wherein he opined that the entire Solid Waste Management System & Ethanol Production Facility (particularly the ethanol production portion of that facility) did not achieve commercial operation because the boilers involved in the February 9, 2007 failed to produce sufficient steam to operate the Ethanol Plant. Exhibit K, p. 2.

---

[1]See *In re E3 Biofuels-Mead, LLC, et. al. v. Zurich American Insurance Company*, U.S. Bankruptcy Court for the District of Kansas, Kansas City Division, Case No. 07-22733; this case was later transferred to U.S. District Court for the District of Kansas and is now titled: *E3 Biofuels, LLC, et. al. v. Zurich American Insurance Company*, U.S. District Court for the District of Kansas, Case No. 08-2674 (hereinafter the "*Zurich*" case). In the *Zurich* case, E3 claims it is entitled to the proceeds of a builder's risk insurance policy because the February 9, 2007 incident allegedly prevented construction of the Ethanol Plant from being completed.

17. In his December 16, 2011 Report, Mr. Madson discussed Katzen's work at the Facility in 2007.  Exhibit K, p. 5-6.

18. In his December 16, 2011 Report, Mr. Madson discussed efforts Katzen undertook to stabilize the Ethanol Plant's operations in 2007.  Exhibit K, p. 5-6.

19. In his March 7, 2012 Report, Mr. Madson opined that he did not observe any inherent technical, mechanical or personnel reasons that would explain why full commercial service and the inherently available capacity of the Ethanol Plant would not have been achieved in the facilities first year of its service.  Exhibit L, p. 7.

20. For the *Zurich* case, Madson provided deposition testimony confirming that Katzen's reputation has been damaged because of this Ethanol Plant.  Exhibit M, p. 163:12 – p. 165:5.

### III. THE SUBPOENA ISSUED TO KATZEN

15. On or about October 31, 2011, PEI served a subpoena upon Katzen requesting certain categories of documents related to the Ethanol Plant.  Exhibits A and B.

16. Through said subpoena, PEI requested information regarding the "Solid Waste Management System & Ethanol Production Facility" (i.e. the "Ethanol Plant") located near Mead, Nebraska that is the subject of the above referenced lawsuit.  Exhibit A.

17. On or about November 21, 2011, Katzen served objections to the subpoena upon PEI. Exhibit C.

18. In doing so, Katzen asserted the following general objections:

    a. Overly broad scope, as it claimed matters not concerning the Ethanol Production Facility are not relevant to the issues in the case.  Exhibit C, p. 2 ¶ 1.

    b. Improper service of the subpoena, as Katzen was not personally served with the subpoena.  Exhibit C, General Objection 1.

    c. Improper form of the subpoena because it did not include the current version of Fed. R. Civ. P. 45(c) and (d).  Exhibit C, General Objection 2.

    d. The subpoena did not allow a reasonable time for a response.  Exhibit C, General Objection 3.

5

e.  The subpoena improperly requested the production of materials in Omaha, Nebraska.  Exhibit C, General Objection 4.

f.  The subpoena was not narrowly tailored, as the materials requested could be obtained from other parties.  Exhibit C, General Objection 5.

g.  The subpoena seeks the production of trade secret information.  Exhibit C, General Objection 5.

h.  The subpoena failed to take reasonable steps to prevent Katzen from incurring undue burden or expenses in attempting to comply with the subpoena.  Exhibit C, General Objection 6.

19. Katzen also asserted specific objections to each category of documents requested; those objections essentially reiterated Katzen's general objection to the relevance of the materials sought and the production of proprietary/trade secret information.  Exhibit C.

20. None of the written objections served by Katzen on November 21, 2011 claim the material requested is protected by the attorney-client, work product, or trial preparation privileges.  Exhibit C.

21. A Protection Order has been entered in the underlying case, so as to preserve the confidentiality of certain proprietary information, documents, and tangible things. Exhibit P.

22. On February 23, 2012, PEI filed a Motion to Compel E3 to produce additional discovery; like Katzen, E3 claimed the Ethanol Plant was not relevant to the issues in this case and, thus, objected to discovery requests for such information.  Exhibit Q, p. 3-4.

23. On June 29, 2012, the U.S. District Court for Nebraska issued an Order finding that "discovery related to other construction problems allegedly occurring at the Ethanol Plant is relevant to the issues involved in this case" and "discovery requests seeking to determine to what extent, if any, other problems caused the alleged failures or completion delays are clearly relevant to the claims and defenses in this case."  Exhibit Q, p. 4.

24. Less than one month later, PEI sent a letter to Katzen requesting that they re-evaluate the objections that they served in response to the subpoena for the following reasons:

6

   a.  The U.S. District Court for Nebraska had evaluated the scope of discovery for this case and found that discovery regarding the Ethanol Plant is relevant, thus rendering Katzen's relevance objection meritless.  Exhibits Q and R.

   b.  Disclosed multiple cases that discredit Katzen's objection to the manner in which it was served with the subpoena and that permit service, via certified mail. Exhibit R.

   c.  Provided Katzen with an updated version of Rule 45(c) and (d).  Exhibit R.

   d.  Provided Katzen with another copy of the Protective Order.[2]  Exhibit R.

25. Thereafter, counsel for PEI and Katzen engaged in multiple telephone conversations discussing steps that PEI was willing to take to ease Katzen's burden of complying with the subpoena.  Exhibits R-V and CC.

26. During those conversations, PEI's counsel requested information regarding the manner in which Katzen stores its documents, as well as information regarding the volume of materials Katzen has so it could devise a plan for easing Katzen's burden in responding to the subpeona.  Exhibit CC.

27. Thus far, Katzen has not disclosed information regarding the manner in which it stores its documentation.  See Exhibit S, T, U p. 2, V, and CC.

28. Despite not knowing how Katzen stores its documentation or the volume of the materials Katzen has, PEI's counsel suggested that it may be willing to ease Katzen's burden in responding to the subpoena by traveling to Katzen's facilities, reviewing its documentation regarding the Ethanol Plant, identifying the relevant materials, and paying for a third-party contractor to copy the relevant materials.  Exhibit CC.

29. Despite not knowing how Katzen stores its documentation, PEI's counsel offered to pay certain expenses associated with having a third-party forensic scientist search, retrieve, and copy Katzen's electronically stored and responsive documentation.  Exhibit U, p. 2 and Exhibit CC.

30. To date, Katzen has not produced estimates or other evidence as to the burden it would incur in responding to the subpoena, in terms of time and expense. Exhibits S, T, and V.

---

[2] A copy of the Amended Complaint and Protective Order was sent with subpoena that was served upon Katzen, via certified mail, on November 4, 2011.

31. PEI has offered to allow Katzen to start the process of responding to the subpoena by producing a limited category of materials, which PEI's counsel would then review to determine whether any additional materials were needed. Exhibit U.

32. The limited category of materials included: (1) correspondence between Katzen, E3, and/or other contractors on this project; (2) operation logs, maintenance logs, work orders and service reports in Katzen's possession and for the Ethanol Plant; (3) timelines, schedules, and punch lists for work to be completed by Katzen at the Ethanol Plant; and (4) warnings, disclaimers, warranties, and guarantees provided by Katzen for this Ethanol Plant. Exhibit U.

33. To date, Katzen has not produced any documentation that would fall within categories (1), (2), or (4). Exhibit CC.

34. To date, Katzen has produced a total of five documents (12 pages of material) pertaining to the Ethanol Plant's construction timeline, schedule, or punch lists, which included two diagrams of the steam distribution system, two "punch lists" from May 2007, and one list of "Outstanding Issues" from January 2007. Exhibit CC.

35. On numerous occasions, PEI has encouraged Katzen to utilize the Protective Order that has been entered in this case, so as to protect their confidential or trade secret information. Exhibit A, R, and U.

36. PEI has also encouraged Katzen to propose modifications to the Protective Order, if it did not deem the protections set forth in Exhibit P to adequately protect its interests. Exhibits R and U.

37. To date, Katzen has not requested modifications to the Protective Order. Exhibit CC.

38. On or about October 25, 2012, PEI re-issued the subpoena to Katzen. Exhibit W.

39. In doing so, PEI personally served Katzen's representative with the subpoena and designated to place of production to be at the office of PEI's local counsel in Cincinnati, Ohio, which is also the city where Katzen's principle place of business is located. Exhibit X.

## IV. APPLICABLE LAW/ARGUMENT - KATZEN WAIVED ITS OBJECTIONS BY NOT TIMELY SERVING THEM

Pursuant to Fed. R. Civ. P. 45(c)(2)(B), a person commanded to produce documents or tangible things may serve on the party designated in the subpoena a written objection to the same. That objection must be served <u>before the earlier of the time specified for compliance or 14 days after the subpoena is served.</u> Fed. R. Civ. P. 45(c)(2)(B) (2012). A failure to serve written objections within the time specified by Rule 45 typically constitutes a waiver of such objections, unless there are unusual circumstances and good cause for such failure. *Powell v. Time Warner Cable, Inc.*, 2010 WL 5464895 at *3 (S.D. Ohio 2010); see also *Forsythe v. Brown*, 281 F.R.D. 577, 587 (D. Nev. 2012).

In this case, the subpoena was served upon Katzen on October 31, 2011. See Exhibit B. It was received by Katzen, as evidenced by the signed certified mail receipt, on November 4, 2011. Exhibit B. Per the certificate of service on Katzen's Objections, Katzen served its written objections on November 18, 2011, four days past the 14 day/November 14, 2011 deadline for serving written objections. As evidenced by the receipt stamp on the upper right hand corner of the cover letter that accompanied Katzen's written objections, PEI did not receive the written objections until November 21, 2011. As such, Katzen failed to serve its objections within 14 days, as required by Rule 45(c)(2)(B) and, therefore, Katzen waived any objections it could have asserted.[3]

PEI further notes that Katzen's November 21, 2011 written objections do not assert claims of attorney-client, attorney-work product, or trial preparation privileges. The first time PEI was notified by Katzen's counsel that it was asserting privilege claims was during telephone conversation that it had with said counsel after it received a letter from them on August 7, 2012. The first written notification that PEI's counsel received suggesting that Katzen was claiming

---

[3] Several correspondences sent by Katzen's counsel suggest that PEI's delay in pursuing Katzen's response to the subpoena was in some way inappropriate. Fed. R. Civ. P. (c)(2)(B) allows a party to move the issuing court for an order compelling the production of a response to a subpoena "at any time". Thus, this assertion is unfounded. PEI further notes that it waited to follow-up with Katzen to obtain its response to the subpoena until after the U.S. District Court for Nebraska ruled upon a Motion to Compel Discovery from E3 because, like Katzen, E3 objected to responding to discovery requests that sought information about the Ethanol Plant. Exhibit Q. Obtaining the U.S. District Court for Nebraska's ruling on this issue was appropriate and done in the interest of completing discovery in an efficient and cost effective manner so as to preserve the resources of the parties, non-parties, and courts – if the U.S. District Court for Nebraska did not rule in favor of PEI on this issue PEI would not have pursued this Motion to Compel. As noted in Exhibit Q, the U.S. District Court for Nebraska disagreed with E3.

9

such privileges was in an October 1, 2012 letter that PEI received from Katzen's counsel. See Exhibit T. Thus, any claims of privilege have not been timely made and have been waived.

## V. APPLICABLE LAW/ARGUMENT – ANY CLAIMS OF PRIVILEGE SHOULD BE GOVERNED BY RULE 45(d)(2)(A)(ii), WHICH REQUIRES THAT PREVILEGED DOCUMENTS BE DETAILED ON A PRIVLEGE LOG.

Fed. R. Civ. P. 45(d)(2)(A)(ii), discusses the methodology that a party should utilize when claiming privilege. It states that a person withholding subpoenaed information under a claim that it is privileged or subject to trial-preparation material must: "(i) expressly make the claim; and (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." Fed. R. Civ. P. 45(d)(2)(A)(ii) (2012); see also *Powell v. Time Warner Cable, Inc.*, 2010 WL 5464895 at *2 (S.D. Ohio 2010) (to the extent the non-party claims the responsive documents are privileged it may submit a privilege log describing the nature of each document withheld and reason for withholding it). In the event the Court finds that Katzen has not waived its privilege objections, PEI requests that the Court order Katzen to comply with Fed. R. Civ. P. 45(d)(2)(A)(ii) when withholding any responsive documentation on a claim of privilege.

## VI. APPLICABLE LAW/ARGUMENTS – THE SUBPEONA WAS PROPERLY SERVED.

Fed. R. Civ. P. 45(b) states that "[s]erving a subpoena requires delivering a copy to the named person…" Fed. R. Civ. P. 45(b)(1) (2012). As noted by multiple District Courts, this Rule does not require that the service be made via personal service, especially when there is a certified mail receipt ensuring that the subpoenaed entity actually received the subpoena. See *Powell v. Time Warner Cable, Inc.*, 2010 WL 5464895 at *2 (S.D. Ohio 2010); *Western Resources, Inc. v. Union Pacific R. Co.*, 2002 WL 1822432 (D. Kan. 2002); *Hall v. Sullivan*, 229 F.R.D. 501 (D. Md 2005); *E.A. Renfroe Company, Inc. v. Moran*, 2008 WL 1806200 (D. Colo. 2008); and *Bland v. Fairfax County, Va.*, 275 F.R.D 466 (E.D. Va. 2011). Katzen's registered agent Gary Hoffmann signed a certified mail receipt on November 4, 2011, thereby acknowledging receipt of the subpoena. See Exhibit B. Moreover, Katzen acknowledge receipt

10

of the subpoena by serving its objections to the subpoena.  As such, this objection lacks merit and should be overruled.

**VII.   APPLICABLE LAW/ARGUMENT – ANY DEFECTS IN FORM OF THE SUBPOENA HAVE BEEN CURED**

Katzen claims the subpoena it received in November 2011 was in an improper form because it did not have a current version of Fed. R. Civ. P. 45(d) and (e) attached.  This defect was cured by July 23, 2012 when Perennial provided Katzen with the proper version of said rules.  Exhibit R.  Thus, this objection no longer has any merit and should be overruled.

**VIII.   APPLICABLE LAW/ARGUMENT – KATZEN HAS HAD MORE THAN A REASONABLE TIME TO RESPOND TO THE SUBPOENA**

Fed. R. Civ. P. 45(a)(1)(iii) requires that a subpoena specify the time and place of production.  Fed. R. Civ. 45(c) allows a party to file a motion seeking that a subpoena be quashed or modified if it:  "(i) fails to allow a reasonable time to comply".

Katzen was served with the subpoena that is the subject of this action nearly a year ago.  That subpoena requested that Katzen produce the responsive documentation by November 30, 2012 (i.e. 30 days from the date it was placed in the mail by PEI's counsel).  Thus, the subpoena provided Katzen with a reasonable time to comply with its requests.  Moreover, since July 23, 2012, counsel for PEI has been in contact with Katzen and has been attempting to work through all objections that Katzen has asserted to the subpoena.  Exhibits S-V and Y-Z.  Those efforts have been met by more objections and thinly veiled attempts to respond to the subpoena, including the production of just five documents when, as discussed in great detail below, there are clearly other materials that are relevant to this suit, responsive to the subpoena, not entitled to trade secret protection, and should be produced.  More importantly, PEI has and continues to invite Katzen to request additional time to respond to the subpoena, so long as Katzen will agree to start producing the relevant material.  Exhibit Z.  Thus far, Katzen has not done so.  As such, this objection lacks merit and should be overruled.

**IX.   APPLICABLE LAW/ARGUMENTS – THE SUBPOENA DID NOT REQUIRE KATZEN TO PRODUCE DOCUMENTS AT A LOCATION MORE THAN 100 MILES FROM ITS PLACE OF BUSINESS**

Fed. R. Civ. P. 45(b)(2)(B) provides that a subpoena may be served "outside that district but within 100 miles of the place specified for the ... production[.]"  The subsection of the rule applicable to a motion to quash provides that a subpoena may be quashed if it requires <u>a person to travel more than 100</u> miles from where he or she is employed, resides, or regularly transacts business in person.  Fed. R. Civ. P. 45(c)(3)(A)(ii) (2012).  Fed. R. Civ. P. 45(c)(2)(A) also provides that a person commanded to produce documents "need not appear in person at the place of production."  See also *U.S. Bank Nat. Ass'n v. James*, 264 F.R.D. 17, 19 (D. Me. 2010) (holding a subpoena that calls for the mailing of documents to a location more than 100 miles from where the subpoena was served does not violate the 100 mile rule).

The subpoena served upon Katzen in November 2011 allowed Katzen to produce the requested documentation by mailing it to counsel for PEI.  Exhibit A, p 5.  As such, Katzen was not required to travel more than 100 miles to produce the requested documentation under the original subpoena.  Regardless, Katzen was re-served with the subpoena on October 25, 2012 and that subpoena allowed Katzen to produce the requested documentation in Cincinnati, Ohio, the same city where Katzen was served with the subpoena and where Katzen regularly transacts business in person.  Exhibit A and W.  Thus, Katzen's objection to the place of production lacks merit and any defect with the subpoena based upon that objection has been cured by the October 25, 2012 subpoena.  Thus, this objection should be overruled.

## X.      APPLICABLE LAW/ARGUMENTS – THE SUBPOENA SEEKS RELEVANT INFORMATION

Under the Federal Rules of Civil Procedure, parties may discover any relevant, non-privileged information that is admissible at trial or reasonably calculated to lead to admissible evidence.  Fed. R. Civ. P. 26(b)(1) (2012).  Relevant information need not be admissible at trial "if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.*; see also *Powell v. Time Warner Cable, Inc.*, 2010 WL 5464895 at *2 (S.D. Ohio 2010) (applying Fed. R. Civ. P. 26(b) to define the scope of relevance when a subpoena has been issued upon a non-party); *GP Industries, LLC v. Bochman*, 2007 WL 4245786 at *4 (D. Neb. 2007). Relevance is broadly construed; a request for discovery should be considered relevant if there is "any possibility" that the information sought may be relevant to the claim or defense of any

party.  *GP Industries, LLC*, 2007 WL 4245786 at *4.  Ohio Courts have similarly stated that Fed. R. Civ. P. 26 is to be construed "broadly to encompass any matter that bears on or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Powell*, 2010 WL 5464895 at *2.

The issues in this case were framed by E3's Amended Complaint, wherein E3 alleged that the Defendants to this litigation were responsible for the supply and start-up of a Dual Fueled Double Boiler System ("Boiler System") and controls, as well as the integration of the Boiler System into the "Solid Waste Management System & Ethanol Production Facility ("Ethanol Plant")."  Exhibit D, ¶ 5.  E3 further alleged that the "[t]he original construction, installation, testing, commissioning and startup of the Ethanol Plant was not substantially completed, and the Ethanol Plant never operated as intended, due to the failure of the Defendants."  Exhibit D.

PEI's Answer and the Rule 26(f) Report go on to clearly establish PEI's defense that there were problems with components of the Ethanol Plant, other than the Boiler System, that prevented this Ethanol Plant/Project from being substantially completed and/or prevented the Ethanol Plant from operating as intended.  Exhibits E and F.  Those problems also prevented the boilers from operating and prevented E3 from mitigating its damages.  *Id.*  Those problems were caused by E3 and/or other contractors working on this project, including Katzen and Dilling.  *Id.*  These defenses are not based upon mere conjecture; they are based upon correspondence obtained from other sources that confirms there were problems occurring throughout the Ethanol Plant after the February 9, 2007 and that prevented the Ethanol Plant from operating as intended, including problems with the Hammermill, Wetcake Conveyor, Jet Cooker, Steam Distribution System, Cooling Tower, Sumps, and an ammonia deficiency.  Exhibits G, H, I, and J.  Katzen had involvement in designing, constructing, and/or resolving these issues.  Exhibits G, H, I, and J.  And, Katzen was accused of causing those problems.  Exhibit I.  At the same time, Katzen accused Dilling of causing those problems.  Exhibit I.

Yet, Katzen claims information regarding the Ethanol Plant is not relevant.  Clearly, and as held by the U.S. District Court for Nebraska, documentation and information about the other problems that occurred at the Ethanol Plant bears on the claims and defenses being asserted in this lawsuit.  Exhibit Q.  Moreover, the subpoena is specifically designed to obtain information

that bears on the issues in this case.  For example, it requests correspondence Katzen had with E3 and other contractors that worked on the Ethanol Plant, which is calculated to obtain information regarding the problems that arose over the course of this project, who Katzen believed caused such problems, and what entity, if any, actually fixed the problem.  Likewise, correspondence would discuss recommendations Katzen made for improving the plant's performance and, thus, information regarding whether E3 mitigated its damages.   The subpoena also requests engineering plans and specifications, as well as timelines, schedules, and punch lists, all of which could lead to information about alterations to the Ethanol Plant's design or construction, when those alternations were made, whether those alterations were made after the February 9, 2007 incident, whether those alterations were made to address some deficiency in the design of the Ethanol Plant, when delays in the construction of the Ethanol Plant occurred, why the delays occurred, and what entity was responsible for addressing issues that caused delays.  Similarly, operation logs, maintenance logs, work orders, and service reports were requested to obtain information about the levels at which the Ethanol Plant was operating after the February 9, 2007, what issues caused the Ethanol Plant to operate at less than desirable levels, and what was done to increase the Ethanol Plant's production levels.  While these examples are only some of the ways the subpoena is designed to illicit information that bears on the issues in this lawsuit, they clearly demonstrate the subpoena is designed to obtain relevant information.   As such, Katzen's objection based upon the relevance of the materials sought should be overruled and Katzen should be compelled to produce the documentation that was requested.

## XI.  APPLICABLE LAW/ARGUMENT – THE SUBPOENA DOES NOT SUBJECT KATZEN TO AN UNDUE BURDEN

A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing an undue burden on a person subject to the subpoena.  If an objection is timely made, the party serving the subpoena "may move the court for an order compelling production…"   Fed.R.Civ.P.  45(c)(2)(B)(i)  (2012).   An order compelling production or inspection "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance."  Fed.R.Civ.P. 45(c)(2)(B)(ii) (2012) (emphasis added).

14

The Court considers various factors to evaluate whether the burden of responding to a subpoena is "significant" or "undue", including, but not limited to: (1) the breadth of the document request, (2) the particularity with which the documents are described, (3) the time period covered by the request, 4) whether the nonparty has an interest in the outcome of the case, (5) whether the information could be obtained from more convenient sources, and (6) whether the nonparty can more readily bear the costs than the requesting party.  See *Kilroy  v. Husted*, 2011 WL 5827229 at *2 (S.D. Ohio 2011); *Georgia-Pac. LLC v. Am. Int'l Specialty Lines Ins. Co.*, 278 F.R.D. 187, 190 (S.D. Ohio 2010); *Allen v. Howmedica Leibinger, GmhH,* 190 F.R.D. 518, 525 (W.D. Tenn. 1999); *In re Exxon Valdez*, 142 F.R.D. 380, 382 (1992) (holding a non-party was not subject to an undue burden in responding to a subpoena when it had an ongoing relationship with several of the defendants to the lawsuit, that 29 percent of its income came from such defendants, and that it had a net worth of $17 million).  Notably, there is no general prohibition on discovery from nonparties to a lawsuit.  *Allen*, 190 F.R.D. at 521 ("[t]he administration of justice would not be aided…by a rule relieving all persons from giving particular evidence on the sole ground that they are not parties to the suit.")  And, protection of a nonparty from significant expense does not necessarily mean that the party issuing the subpoena must bear the entire cost of compliance.  See *Georgia-Pac. LLC*, 278 F.R.D. at 190; see also *In re Honeywell Intern, Inc. Securities Litigation*, 230 F.R.D. 293, 303 (S.D.N.Y. 2003) ("[a] non-party can be required to bear some or all of its expense where the equities of a particular case demand it.")  Courts have also compelled non-parties to produce documents responding to a subpoena and refused to award expenses when the subpoenaed party has not offered any basis for determining the reasonable costs for compliance with the subpoena.  See *In re Honeywell*, 230 F.R.D. at 303.

When considering the factors for evaluating whether the burden is undue, this objection should be overruled.  First, the breadth of information requested and particularity with which it is described is narrowly tailored to specific categories of relevant documents, such as: (1) the type of material requested (i.e. engineering specifications, invoices, receipts, correspondence, ect.); (2) the particular information sought (i.e. information regarding plant start-ups or shut downs; and/or (3) the identities of the individuals or entities that were involved in the correspondence. See Exhibit A.  Without actually having access to the information it would be nearly impossible

to further narrow the requests so as to describe the information sought with more particularity. Moreover, through correspondence with Katzen's counsel, PEI has agreed to allow this production to begin with the production of four specific categories of material, which it would review and utilize to determine whether additional documentation needs to be produced. Exhibit U and CC. There is no other way to further narrow the breadth or descriptions of these requests without PEI giving up its right to investigate the issues in this case and prepare its defenses. As such, the first and second factors weigh in favor of finding that the burden imposed by the subpoena is not "undue".

Each request also limits the time period of the production sought to a specific timeframe that does not exceed the time that Katzen started working on this project to the present date. At this time, it appears this is a seven to eight year time period because Katzen, apparently started working on this project on or about April 22, 2005, when the original Consulting & Engineering Services Agreement was entered into. See Exhibit N, p.2. Information Katzen has "to the present date" is also within the pertinent and relevant time period because Katzen is still involved in the completion of this Ethanol Plant. See Exhibit M, p. 167-168 and N. Thus, information about Katzen's ongoing work at the Ethanol Plant is likely to lead to information about problems it should have addressed in 2007 and is just now addressing to re-start this Ethanol Plant. Such information is also needed to evaluate what, if anything, E3/AltEn, LLC has or is doing to mitigate its damages by attempting to restart the Ethanol Plant. It is also important to note that the U.S. District Court has found that the information sought regarding ongoing work that is being completed at this plant is relevant and discoverable. See Exhibit Q, p. 6. As such, the third factor, the time period covered by the request, also weighs in favor of finding that the burden imposed by this subpoena is not "undue."

Katzen also has an interest in the outcome of this case. Specifically, the opinions offered by its President for the *Zurich* case will be validated or invalidated by the outcome of this case. See Exhibits K, L, and M. More importantly, Katzen has an interest in blaming another entity for this Ethanol Plant's failure, so as to save its own reputation as the Ethanol Plant's designer. This is clear from testimony given by Mr. Madson who stated "[t]he negative reputation issues we take very, very seriously. From a reputational point of view in the industry, E3 [i.e. the Ethanol Plant] has been troubling to our reputation." Exhibit M, p 162-164. Apparently, Katzen

16

is still trying to repair the damage that was caused to its reputation by this Ethanol Plant, as it entered into an Amended & Restated Consulting & Engineering Services Agreement to continue its efforts to start-up this Ethanol Plant.  See Exhibit M, p. 166-168, as well as Exhibits N and O. Pursuant to the Amended and Restated Services Agreement and the Amended & Restated License Agreement, Katzen will also be paid a minimum of $1,253,000 in consulting and licensing fees upon completion of this Ethanol Plant, which evidences Katzen's ongoing financial interest in this Ethanol Plant.  Exhibit N and O.  It also stands to obtain future licensing agreements with the Plant's current owner.  Exhibit O.  All of this indicates that, much like the subpoenaed nonparty in *Valdez*, Katzen has clear and ongoing interest in this litigation, as well as the Ethanol Plant.  Therefore, the fourth factor, whether the nonparty has an interest in the litigation, weighs in favor of finding that Katzen's production of responsive documents would not be an "undue" burden.

The information sought through these requests is also not available from a more convenient source.  Specifically, E3 has responded to multiple discovery requests for the same information by stating the information in its "possession or control has been provided."  Exhibits AA and BB.  In doing so, E3 suggests that some other entity has possession and control of the requested information, such as engineering drawings, specifications, operation logs, information regarding start-ups and shutdowns of the Ethanol Plant, problems or deficiencies that prevented the Ethanol Plant from starting-up, and work that Katzen was hired to perform after E3 filed for bankruptcy.  See Exhibits G – O, as well as Exhibits AA and BB.  If E3 does not have custody and control over such materials, it only logically follows that the information regarding these matters must be obtained from other sources that were and continue to be involved in the construction and start-up of the Ethanol Plant, including Katzen.  See Exhibits G – O, as well as Exhibits AA and BB.  Perhaps more importantly, it seems unlikely that E3 would have access to documentation about the Ethanol Plant that Katzen didn't share with E3, such as its engineering specifications for the Ethanol Plant, internal correspondence regarding the Ethanol Plant, and correspondence that Katzen exchanged with other contractors on the project.   Katzen's documentation is the most logical place to look for such information.  Therefore, the fifth factor, whether the information is available from other sources, weighs in favor of finding that the burden imposed by this subpoena is not undue.

It would also seem logical that Katzen review its documentation from this "unilateral E3 disaster" as it prepares to move forward with the completion of this Ethanol Plant.  See Exhibit M, pp. 162-168, as well as Exhibits N and O.  Katzen could minimize the cost associated with responding to this subpoena by completing that review and a review of its documentation for the purpose of responding to this subpoena simultaneously.  This, in combination with the fact that Katzen will eventually be fully compensated for its work on this project, as evidenced by Exhibits N and O, indicates that Katzen can more readily bear the cost associated with this discovery than PEI, who has not and will not be paid for all of the services it rendered for this project and has no ongoing relationship with the owners of the Ethanol Plant for the completion of this project.  Thus, the sixth factor weighs in favor of finding the subpoena does not impose an undue burden upon Katzen.

In sum, the factors to be considered when evaluating whether an undue burden is imposed upon a nonparty weigh heavily in favor of finding this subpoena does not impose an undue burden upon Katzen.  Even more importantly, PEI has gone to great lengths to ease any burden that could be imposed upon Katzen.  To do so, PEI's counsel requested information about the volume and manner in which the documentation is stored so that it could devise a plan to ease the burden and expense in responding to the subpoena.  Exhibit CC.  For example, if the material was primarily stored in a tangible place, PEI's counsel proposed that it travel to Katzen's facilities to search through the material and identify the responsive materials so such material could be copied by a third-party document production company, at PEI's expense.  Exhibit CC.  PEI has also offered to pay for a third-party to complete forensic searches of its electronically stored information and make copies of that information.  Exhibit U and CC.  To further ease Katzen's burden in reviewing that information, it offered to have said third-party contractor search for terminology that would help Katzen locate its proprietary information, so as to exclude that information from the production.  *Id.*  To date, Katzen has not provided information as to the volume of the material Katzen has, the manner in which the material is stored, or the actual time and expense that would be expended by Katzen to respond to the subpoena.  As the court did in *In re Honeywell*, this Court should compel Katzen's production of the material and not award Katzen any expenses associated with the production because Katzen has thus far not provided any basis for determining the costs it would incur when complying with

18

the subpoena and has not agreed to any other reasonable proposal offered by PEI to ease whatever burden Katzen would incur in responding to the subpoena.

## XII. TRADE SECRET

Fed. R. Civ. P. 45(c)(3)(B)(i) governs the circumstances under which a subpoena may be quashed by a court - "a court may quash or modify a subpoena if it requires disclosure of a trade secret or other confidential research, development, or commercial information." To determine whether information is afforded trade secret protection, courts must evaluate whether the information being sought is commercial information that should not be disclosed to the public. *Falicia v. Advanced Tenant Services, Inc.*, 235 F.R.D. 5, 7 (D.D.C. 2006) (citations omitted). In making this assessment courts have traditionally evaluated whether the release of the information would unfairly harm the disclosing party's ability to compete in the marketplace. *Id.*; see also *Dow Corning Corp. v. Jie Xiao*, 2012 WL 1957293 (E.D. Mich., May 31, 2012)(citations omitted) ("[t]o resist discovery…a person must first establish that the information sought is a trade secret and then demonstrate that its disclosure might be harmful.") Another relevant factor is who could potentially receive the information. *Falicia*, 235 F.R.D. at 7 (citations omitted). Courts understandably "presume[] that disclosure to a competitor is more harmful than disclosure to a noncompetitor." *Id.* (citations omitted).

PEI is a design and manufacturing company that specializes in waste gas processing systems and equipment. It does not compete with Katzen, which designs ethanol production facilities and, thus, PEI would be entitled to a presumption that the disclosure of this information is marginally harmful, if it is at all harmful. More importantly, thus far Katzen has not demonstrated how any of the information sought is "confidential" commercial information or would result in any harm to Katzen if it were disclosed. In fact, a vast majority of the information sought had to be shared with other entities involved in the construction and/or startup of the Ethanol Plant. For example, Katzen had to share its engineering specifications, timelines, schedules, and operation logs with Dilling[4] and/or E3 so that they could actually construct, start-up, test, and/or operate the Ethanol Plant. Likewise, correspondence between

---

[4] Dilling was required by its General Contractor Agreement with E3 to construct and test the Ethanol Plant. See Exhibit D, ¶ 14.

Katzen, E3, Dilling, and/or other contractors on this project was by its very nature shared with entities not associated with Katzen and, thus, would not qualify as confidential commercial information.  Moreover, Katzen would not be harmed by the re-disclosure of such information in response to this subpoena.  And, any harm that Katzen believes it could be subjected to could be further negated by the use of a Protective Order, which Katzen has thus far refused to utilize. Exhibit CC.  Any harm Katzen could incur from disclosing information that is responsive to the subpoena is far outweighed by the benefit of ensuring the administration of justice in this lawsuit through a fair and efficient discovery process, a purpose that would not be served if Katzen is allowed to withhold relevant material under the unsupported claim of trade secret protections.

## XIII.   CONTEMPT AND SANCTIONS

Fed. R. Civ. P. 45(e) provides that a court may "hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena."  A party moving to hold a non-party in contempt under this rule is not required to first obtain a court order compelling compliance with its subpoena, unless written objections to the subpoena are timely filed.  See *U.S. SE.C. v. Hyatt*, 621 F.3d 687, 695 (7th Cir. 2010) (holding that, because the subpoenaed party did not object to the subpoena, disobedience with a prior court order was not necessary to hold the subpoenaed entity in contempt, so long as the subpoenaed entity was procedurally given the opportunity to demonstrate that it exercised good faith in attempting to comply with the subpoena).  The initial question regarding contempt "has long been whether [contemnors] have performed all reasonable steps within their power to insure compliance.  *Forsythe v. Brown*, 281 F.R.D. 577, 588 (D. Nev. 2012) (imposing sanctions when the evidence revealed a "shell game" by which the plaintiff and their counsel – with the compliance of the subpoenaed nonparty delayed discovery to keep the defendants in the dark about critical information about the plaintiff's claims).

As discussed above, Katzen failed to timely serve its objections to the subpoena, as such Katzen's disobedience with a prior court order is not necessary to hold Katzen in contempt. And, the correspondence exchanged with Katzen's counsel demonstrates its failure to perform all reasonable steps to ensure compliance with the subpoena, particularly its refusal to provide estimates about the volume of materials it would be required to produce, the manner in which the

information is stored, or estimates as to the expense it would incur in responding to the subpoena. Katzen's failures to take reasonable steps to comply with the subpoena are further evidenced by its refusal to accept proposals presented by PEI's counsel to address Katzen's objections based upon the burden it would incur and the disclosure of trade secret information, as well as Katzen's refusal to propose any alternatives to PEI's proposals regarding these matters. Moreover, Katzen's ongoing involvement with this Ethanol Plant, its objections and disobedience with the subpoena, and E3's suggestion that it does not have certain information that was requested from both of these entities, is indicative of a "shell game" that E3 and Katzen are engaged in to keep PEI in the dark about critical information surrounding this Ethanol Plant. As in *Forsythe*, sanctions should be imposed for this type of conduct.

## XIV.  CONCLUSION

For all of the reasons stated above, PEI requests that Katzen be compelled to produce the requested information at its own expense. PEI further requests that Katzen be ordered to pay the attorney's fees and expenses that PEI incurred in filing this Motion to Compel as a sanction for its failure to take reasonable steps to comply with this subpoena.

Respectfully submitted,


PERENNIAL ENERGY, INC., Movant/Defendant


s/ Michael Mahon
Michael Mahon, Esq. (0087296)
Reminger Co., L.P.A.
525 Vine Street, Suite 1700
Cincinnati, OH 45209
Phone: (513) 721-1300
Email: MMahon@reminger.com

21

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of November, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

s/ Michael Mahon
Michael Mahon, Esq. (0087296)
Reminger Co., L.P.A.
525 Vine Street, Suite 1700
Cincinnati, OH 45209
Phone: (513) 721-1300
Email: MMahon@reminger.com

R. Guy Taft
Strauss Troy Co. LPA
150 East Fourth Street
4th Floor
Cincinnati OH 45202-4018
email : rgtaft@strausstroy.com

**Attorney for Respondent, Katzen International, Inc.**

22